IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA

In the Matter of:                                                  Case No. **05-07378-lmj7**

**Beth A. Faler,**                                                 PRE BAPCPA CASE
                                                                   [UNPUBLISHED]
        Debtor

**MEMORANDUM OF DECISION**
**(date entered on docket: September 20, 2010)**

      The United States Trustee for Region 12 ("U.S. Trustee") filed an 11 U.S.C. section 707(b) (2000) motion to dismiss this Chapter 7 case. The U.S. Trustee contends permitting Debtor Beth A. Faler ("Debtor") to proceed with this liquidation case would be a substantial abuse of the provisions governing Chapter 7 because Debtor has the ability to pay a significant percentage of her consumer debt when her non-filing spouse's income is taken into consideration and when scheduled expenditures are decreased in line with collection financial standards utilized by the Internal Revenue Service ("IRS"). Debtor maintains there is no disposable income to fund a Chapter 13 plan if her non-filing spouse's debts and expenditures are taken into account. Having reviewed the record and the arguments of the parties, the Court enters its decision in favor of the Debtor.

      The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the U.S. District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. section 157(b)(2)(A) and (O).

BACKGROUND

      Debtor, who has been an administrative assistant with Iowa Bank and Trust Company in Iowa City, Iowa for approximately two decades, married John Francis

McGinnis ("Mr. McGinnis" or "non-filing spouse") approximately 19 months before she sought relief under Chapter 7 of Title 11 of the United States Code on September 23, 2005. Debtor and her non-filing spouse reside together and pool their incomes to pay their expenses.[1] She has no dependents. Mr. McGinnis' children do not reside with them.

On Schedule I (Current Income of Individual Debtor(s)), Debtor reported that her net monthly income was $1,989.32, her non-filing spouse's net monthly income was $2,970.64 and their combined net monthly income was $4,959.96. In her written objection to the motion to dismiss, Debtor explained that she had erred in the computation of Mr. McGinnis' net monthly income. She should have listed it at $4,278.11, meaning the combined net monthly income was actually $6,267.43. On Schedule J (Current Expenditures of Individual Debtor(s)), she listed monthly expenses totaling $5,941.16. Those expenses included Mr. McGinnis' $652.50 commuting costs and his $1,050.00 payment on a consolidation note secured by his vehicle.[2] They did not include monthly payments on his unsecured debts.[3] In the objection, Debtor

---

[1] Debtor testified that she and her non-filing spouse put their incomes into one checking account from which they pay their bills. She stated that they handle their finances jointly. Mr. McGinnis' testimony was generally consistent with Debtor's testimony. Exhibit D, however, contains bank statements from Iowa State Bank & Trust Company ("Bank") bearing only Mr. McGinnis' name and containing direct deposits only for his wages. There may be an explanation for the inconsistency between the testimony and the exhibit, but neither the U.S. Trustee's attorney nor Debtor's attorney covered this matter in questioning or in argument.

[2] Mr. McGinnis testified that he obtained a $79,881.73 loan from the Bank in September of 2002 to pay off a lot of unsecured debt he had incurred around and after the time of his divorce in 1996. His parents were cosigners. He pledged his unencumbered 1995 GMC Suburban that was worth approximately $8,000.00 and a 1989 Glastron Sierra Boat as collateral. Mr. McGinnis stated that he subsequently sold the boat for approximately $3,000.00 and the proceeds were applied against the balance he owed the Bank. When the Suburban's transmission failed sometime after Debtor commenced this case, he replaced that vehicle with a used 2000 Chevrolet Suburban that he purchased for $10,000.00 with full financing from the Bank. (According to Exhibit I, the September 2002 fixed rate consumer note, disclosure and security agreement, the Bank's security interest would extend to the replacement vehicle.)

[3] Mr. McGinnis testified that his minimum monthly payments on five credit cards total $425.00. He expends monthly $90.00 for check overdraft protection and $284.00 toward paying off a judgment against him. (Though $60.00 in monthly interest related to a renewable consumer balloon note appears as a

indicated that Mr. McGinnis pays approximately $1,060.00 child support via an automatic debit from his bank account. That increases the total monthly expenses to $7,001.16—an amount exceeding net monthly income by $733.73.

On Schedule D (Creditors Holding Secured Claims), Debtor listed one vehicle debt and two mortgage debts totaling $170,531.00.[4] On Schedule E (Creditors Holding Unsecured Priority Claims), she indicated she had no debts under this category. On Schedule F (Creditors Holding Unsecured Nonpriority Claims), she listed 14 debts totaling $112,200.00.[5] Debtor testified that some of her scheduled debts were incurred before her marriage and some were incurred after her marriage.[6] A portion resulted from credit card cash advances that covered basic expenses when Mr. McGinnis was out of work.

Mr. McGinnis, an accounting manager for more than two decades, testified that he once earned as much as $90,000.00 to $100,000.00 a year but salaries at subsequent employments ranged between $65,000.00 and $70,000.00 annually. He started working for Barnstead International in Dubuque, Iowa approximately 6 months before Debtor filed her petition. Immediately prior to securing that work, he had been unemployed for three months. During that time, he received $1,200.00 a month in

---

"necessary expense" on Exhibit F, a household income and expenses worksheet that Debtor's attorney prepared, said amount does not appear on Exhibit G, an income and expense analysis that Mr. McGinnis prepared.)

[4] The docket reflects that Debtor entered into reaffirmation agreements with the Bank regarding her vehicle and with EMC Mortgage Corporation regarding the two mortgage debts. (Docket Nos. 10, 20 and 21.)

[5] The docket reflects that Debtor entered into two more reaffirmation agreements with the Bank. One covered a $2,000.00 line of credit. (Docket No. 9.) The other covered a $47,749.00 cosigned loan. (Docket No. 11.) On Schedule H (Codebtors), Debtor listed a Margaret Diller as the codebtor on this obligation.

[6] The parties do not dispute that Debtor's debts are primarily consumer debts.

unemployment compensation. At his current employment, he was a salaried employee earning between $69,000.00 and $70,000.00 annually.

U.S. Trustee Exhibit 1 (Calculation of Income) indicates Debtor's net monthly income is $1,999.18 and her non-filing spouse's net monthly income is $4,278.11. Their combined and rounded down net monthly income is $6,277.00—an amount exceeding what Debtor stated by $9.57. L. Todd Vandenberg, the U.S. Trustee's Bankruptcy Analyst for the Southern District of Iowa, testified that the figures on the exhibit were based on Debtor's semi-monthly pay advice and Mr. McGinnis' bi-weekly pay advice for the pay period closest to the petition date.

U.S. Trustee Exhibit 2 (Analysis of Schedule J – Current Expenditures of Individual Debtor(s)) compares expenses Debtor listed on Schedule J with IRS standards based on Bureau of Labor statistics. Specifically, the exhibit indicates Debtor claimed (1) housing and utilities in the amount of $1,609.00 versus the IRS allowance of $1,150.00, (2) food, clothing and other items in the amount of $1,580.00 versus the IRS allowance of $1,280.00, and (3) transportation in the amount of $2,752.00 versus the IRS allowance of $1,158.00. With respect to uncategorized expenses, the exhibit indicates Debtor did not claim such an expense on Schedule J and therefore sets forth no IRS allowance. In sum, Debtor's scheduled total expenses of $5,941.00 exceeded the total IRS allowance of $3,588.00 by $2,353.00.

U.S. Trustee Exhibit 3 (Repayment Capacity) suggests that Debtor should have $2,689.00 monthly disposable income after taking into account the adjusted income of $6,277.00 and the proposed expenses of $3,588.00. In turn, that amount of monthly disposable income would yield $96,804.00 disposable income over three years and

$161,340.00 disposable income over five years. With respect to Debtor's $112,200.00 unsecured debt, said total amounts of disposable income would provide debt service of 86.28% and 143.80% respectively.

Mr. Vandenberg acknowledged that the non-filing spouse's child support obligation was missing from his calculations and should be allowed as an uncategorized expense. That would change the repayment capacity figures to $1,629.00 monthly disposable income ($2,689.00 − $1,060.00),[7] $58,644.00 disposable income over three years ($1,629.00 x 36), $97,740.00 disposable income over five years ($1,629.00 x 60), 52.27% debt service over three years ([$58,644.00 x 100] ÷ $112,200.00), and 87.11% debt service over five years ([$97,740.00 x 100] ÷ $112,200.00).

On cross-examination, Mr. Vandenberg stated that he assumed the non-filing spouse could reduce his transportation costs significantly and still maintain his level of income. He based that in part on documentation Debtor provided in support of the commuting expenses she set forth on Schedule J. He, however, identified the $1,050.00 car payment as the main problem in the transportation category. He assumed that Mr. McGinnis could rid himself of that debt and obtain a more economical vehicle. He agreed that Mr. McGinnis had unsecured debts that were not included on Debtor's Schedule J but did not agree that he should have taken those debts into account when preparing Exhibit 2. In sum, with the exception of the child support obligation, it was Mr. Vandenberg's opinion that the non-filing spouse's "other unsecured debt shouldn't be elevated any higher than Mrs. Faler's debt. So allowing

---

[7] Mr. Vandenberg testified that the monthly child support obligation was $1,059.00. Mr. McGinnis testified that the amount was $1,059.95. Exhibit D, consisting of the previously mentioned Bank statements in Mr. McGinnis' name, shows $489.21 transfers bi-weekly and that amounts to $1,059.95 monthly. For the purpose of the calculation, the Court rounded up the amount to $1,060.00.

Mr. McGinnis to take money out of the household to pay his similarly situated unsecured debt from Mrs. Faler's debt would be unfair to the unsecured debtor's creditors." (Tr. 18, ll. 9-13.)

## APPLICABLE LAW

11 U.S.C. section 707(b) (2000) provides in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. section 707(b) (2000). The Eighth Circuit substantial abuse inquiry focuses primarily on an individual debtor's ability to pay his or her debts. See In re Koch, 109 F.3d 1285, 1288 (8th Cir. 1997); U.S. Trustee v. Harris, 960 F.2d 74, 77 (8th Cir. 1992); Fonder v. United States, 974 F.2d 996, 999 (8th Cir. 1992); In re Walton, 866 F.2d 981, 984-85 (8th Cir. 1989). The ability to pay is typically measured by assessing how much disposable income a debtor would be able to pay his or her unsecured creditors under a three to five year Chapter 13 plan. See Koch, 109 F.3d at 1288. 11 U.S.C. section 1325(b)(2) (2000) defines "disposable income" as follows:

> "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor . . . and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2) (2000). The controlling circuit case law does not require a trial court to find a debtor can pay a specific threshold of unsecured debt over three to five

years before that court may conclude the Chapter 7 filing amounts to substantial abuse. Rather, "the essential inquiry remains whether the debtor's ability to repay creditors with future income is sufficient to make the Chapter 7 liquidating bankruptcy a substantial abuse of the Code." Fonder, 974 F.2d at 999.

## DISCUSSION

Resolution of the pending controversy first requires the Court to determine how much disposable income Debtor would likely have to fund a Chapter 13 plan. Then the Court must decide whether allowing Debtor to retain that amount in lieu of paying her unsecured debts is a substantial abuse of the Chapter 7 provisions.

I. The Disposable Income Calculation

### Monthly Income

There is no substantive dispute regarding the net monthly incomes of Debtor and the non-filing spouse. To the extent there is a slight variance between the amounts the U.S. Trustee set forth in Exhibit 1 and the amounts Debtor set forth on Schedule I for her income and in Exhibit 7 for her income and that of the non-filing spouse,[8] the Court adopts the figures of the U.S. Trustee because they were based on pay advices for the pay periods closest to the petition date. Accordingly, the Court finds that the combined net monthly income is $6,277.00.

### Monthly Expenses

With the exception of Mr. McGinnis' commuting expense, the U.S. Trustee does not appear to contend that the expenses in issue are not the actual amounts Debtor and

---

[8] Debtor listed her net monthly income as $1,989.32 on Schedule I and Exhibit F. The U.S. Trustee reported $1,999.18 on Exhibit 1. As previously discussed, Debtor acknowledged an error in computing Mr. McGinnis' net monthly income on Schedule I. On Exhibit F, she indicated the correct amount is $4,278.16. The U.S. Trustee reported $4,278.11.

her non-filing spouse incur on a routine basis.[9]  Rather, the U.S. Trustee questions whether the amounts are reasonable when compared to the IRS standards for three of the following four categories:

*Housing and Utilities (Local Standard for Johnson County, Iowa).*[10]  The relevant maximum allowance is $1,150.00.  On Schedule J and Exhibit F (Household Income and Expenses Worksheet), Debtor claims a total of $1,609.25.  That amount includes $1,263.00 for two mortgages,[11] $45.00 for electricity and gas,[12] $45.00 for water and sewer,[13] $93.00 for telephone, $75.00 for home maintenance, $75.00 for homeowners association fees, and $13.25 for homeowners insurance.

The $459.25 difference between the sum of the actual expenses and the standard for this category of expenses may be attributable to the monthly payments on the two mortgages that Debtor and Mr. McGinnis acquired shortly before Debtor commenced this case.  Both testified that they moved from North Liberty, Iowa to Lisbon, Iowa in order for Mr. McGinnis to cut his travel time to his place of employment

---

[9] Until passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 was imminent, the U.S. Trustee in this district would challenge specific expenses listed in a debtor's budget as being not actual, unreasonable or both. If the U.S. Trustee contended a line item on Schedule J was not an actual expense or the claimed amount exceeded the actual expenditure, the Court expected the debtor to provide proof to the contrary.  Though the documentary evidence in this case contains relatively little evidence of actual expenditures, the Court will not weigh that lack of evidence against Debtor due to the different approach the U.S. Trustee took in this and other 11 U.S.C. section 707(b) (2000) hearings around the time the 2005 amendments were enacted.

[10] According to information available at the IRS Web site, the IRS usually allows the amount actually spent or the amount established by the standard—whichever is less.

[11] According to the reaffirmation agreements, the monthly payments total $1,253.46.  (Docket Nos. 20 and 21.)

[12] Exhibit Q, consisting of a few utility bills, suggests that Debtor and her non-filing spouse pay approximately $150.00 to $200.00 more monthly for electricity and gas.  The bills, however, were limited to three winter months.

[13] The previously mentioned Exhibit Q also contains three statements that appear to be related to water and sewer expenses.  Those statements indicate that Debtor and her non-filing spouse pay between $6.00 and $11.00 more monthly for water and sewer services.

in Dubuque, Iowa by approximately a half hour.[14] They decided to purchase a condominium in Lisbon because the total of the monthly mortgage payments was no more than what they had been paying to rent a condominium in North Liberty.[15] On Schedule A (Real Property), Debtor indicates that the market value of the condominium is $147,000.00 and that it secures total debt of $147,950.00. Based on the record, the Court finds that the mortgage payments and the other actual expenses in this category are reasonable.[16]

*Food, Clothing and Other Items (National Standard).*[17] The relevant maximum allowance is $1,280.00. On Schedule J and Exhibit F, Debtor claims a total of $1,580.41. That amount includes $691.00 for food, $150.00 for clothing, $50.00 for laundry and dry cleaning, $200.00 for medical and dental,[18] $100.00 for recreation, $31.41 for health insurance, $45.00 for cable television, $134.00 for miscellaneous items, $108.00 for housekeeping supplies, and $71.00 for personal care products.

The reason for the $300.41 difference between the sum of the actual expenses and the standard for this category of expenses is not readily discernable. The Court

---

[14] Debtor testified that her travel time to her place of employment in Iowa City, Iowa increased by 15 minutes as a result of the move.

[15] Mr. McGinnis testified that Debtor and he borrowed the full balance of the purchase price and "put no money up." (Tr. 26, l. 12.) However, Exhibit O, a borrower's closing statement, suggests that only Debtor was the borrower and that she had deposited $500.00 and owed a balance of $568.00 that was not covered by the financing. Debtor's schedules do not indicate whether she owns and is liable for the debt against the condominium solely or jointly with her non-filing spouse. Neither the U.S. Trustee's attorney nor Debtor's attorney clarified the record via testimony or argument.

[16] The U.S. Trustee used the $1,150.00 standard applicable for the county in which Debtor and her non-filing spouse resided at the time Debtor commenced this case rather than the $985.00 standard applicable for Linn County, IA—the county to which they moved a few weeks later. (U.S. Trustee Exhibit 4.) The U.S. Trustee's attorney did not address this in questioning or in argument. The Court assumes that was done to be consistent with most past 11 U.S.C. section 707(b) (2000) hearings in which the circumstances at the time of filing generally controlled the outcome of the contested matter. In any event, the $165.00 difference between the standards would not have caused the Court to change the finding under this category.

[17] According to information available at the IRS Web site, the IRS allows the amount established by the standard—without questioning the amount actually spent.

[18] Exhibit R contains various medical bills for Mr. McGinnis. If the Court were trying to verify this budget item, this exhibit would not support the amount listed on Schedule J.

suspects that one of the items that appears on Schedule J is not an actual expenditure from Debtor's net monthly income. That is, Debtor lists $31.41 for health insurance on Schedule J but also lists a $62.82 deduction for insurance on Schedule I. At a minimum the Court finds it curious that Debtor, who is paid semi-monthly, listed an amount on Schedule J that is exactly half the amount on Schedule I.[19] Moreover, with respect to the element of reasonableness, the Court observes that amounts Debtor claimed for food, recreation, miscellaneous and personal expenses exceed amounts this Court has allowed in past written decisions and bench rulings dealing with 11 U.S.C. section 707(b) (2000).[20] Nothing in the record supports finding that application of the standard is not appropriate in this case. Accordingly, the Court finds that the claimed expenses under this category should be reduced by $300.41 to $1,280.00.

*Transportation (Local Standard – Midwest Region).*[21] The relevant maximum allowance is $1,158.00—consisting of $813.00 ownership costs ($475.00 for first car and $338.00 for second car) and $345.00 operating costs (total for two cars). (U.S. Trustee Exhibit 4.) On Schedule J and Exhibit F, Debtor claims a total of $2,751.50. That amount includes $1,549.00 ownership costs, consisting of $499.00 for her automobile installment payment[22] and $1,050.00 for Mr. McGinnis' payment of the consolidation loan secured by his vehicle, and $1,202.50 operating costs, consisting of

---

[19] Exhibit M consists of Debtor's pay advices from July 1, 2005 to October 15, 2005. Those advices indicate a total of $31.41 is deducted for her health and dental insurance each pay period.

[20] Exhibit P, a notice of insurance payments due on a monthly basis, includes $75.00 for Mr. McGinnis' life insurance policy and $23.75 for a personal articles policy. Those items do not appear on Schedule J or Exhibit F. With respect to at least the former expense item, the Court typically disallowed expenses related to whole life insurance because that type of insurance amounts to a savings vehicle. Likewise, the Court typically disallowed expenses related to term life insurance if both the debtor and the debtor's spouse (whether joint debtor or non-filing spouse) were employed. Perhaps the life insurance policy in this case is for the benefit of Mr. McGinnis' children. The record is silent on this matter.

[21] According to information available at the IRS Web site, the IRS usually allows the amount actually spent or the amount established by the standard—whichever is less.

[22] According to the reaffirmation agreement, the monthly payment is $499.67. (Docket No. 10.)

$345.00 for her commuting expenses, $652.50 for his commuting expenses, and $205.00 for automobile insurance.[23]

Mr. Vandenberg testified that the main reasons for the $1,593.50 difference between the sum of the actual expenses and the standard for this category of expenses are Mr. McGinnis' monthly commuting expenses and his monthly payment on the debt secured by his vehicle. With respect to the former, he did not appear to challenge the number of miles Mr. McGinnis drives but did comment that Debtor's exhibits did not support her non-filing spouse's commuting expenses.

*Operating Costs*

Above average operating costs are justifiable in this case. Debtor and her non-filing spouse find themselves in a situation for which there does not appear to be a reasonable alternative. Mr. McGinnis secured the best income-producing job he could find at distance not so far away that it would have required Debtor to give up her employment. They moved to a location that reduced Mr. McGinnis' commuting expenses more than it increased Debtor's commuting expenses.

The record suggests that the actual operating costs are similar to the numbers Debtor set forth on Schedule J and Exhibit F. According to Exhibit S, a spreadsheet Mr. McGinnis prepared regarding his mileage and Debtor's mileage for the first seven weeks in 2006, he drove an average of approximately 630 miles per week and Debtor drove an average of approximately 338 miles per week.[24] Mr. McGinnis used an

---

[23] The previously mentioned Exhibit P indicates that Debtor and her non-filing spouse spend $54.22 to insure her 2000 Pontiac and $69.92 to insure his 2000 Chevrolet. With the exception of a comment on the notice that the rate for the Pontiac had changed due to operator age, nothing in the record explains the $80.86 difference between the $124.14 total expenditure for car insurance on this exhibit and the amount Debtor set forth on Schedule J and Exhibit F.

[24] The Court's calculations excluded the last two entries (roundtrip mileage for a day falling outside the seven week time frame) for Mr. McGinnis and for Debtor. The Court's calculations also excluded the last

estimated cost of $2.29 per gallon in one column of his spreadsheet and an IRS reimbursement allowance of "@.445" in another; however, neither expense figure comes close to mirroring the IRS collection financial standard that the U.S. Trustee employed.[25] Relying on information contained in Debtor's Exhibit C ("Your Driving Costs 2006," an AAA Publication) that sets forth operating costs for various vehicles based on gas, maintenance and tires, and then taking into account the amount for auto insurance appearing on Schedule J and estimating other relevant costs, the Court finds that the scheduled $1,202.50 operating costs are reasonable.[26]

*Ownership Costs*

Debtor's $499.00 automobile installment payment exceeds the $475.00 IRS allowance for a first vehicle by only $24.00. The Court finds this scheduled ownership cost to be reasonable. Mr. McGinnis' $1,050.00 installment payment on the consolidation loan secured by his vehicle exceeds the $338.00 IRS allowance for a second vehicle by $712.00. The difference is due to this obligation being a consolidation loan rather than the type of car loan addressed by the IRS standard.

Mr. McGinnis incurred this obligation in an effort to pay off his past unsecured debts. His parents are cosigners. The record does not suggest that Mr. McGinnis has

---

week for Debtor because many of the entries appeared to duplicate those for McGinnis—with the curious exception of there being a difference of between one mile and four miles per entry for each listing. Hence the respective averages are based on adding seven weeks of mileage and dividing by seven and adding six weeks of mileage and dividing by six.

[25] According to information available at the IRS Web site, the operating costs consist of maintenance, repairs, insurance, fuel, registrations, licenses, inspections, parking and tolls.

[26] Mr. McGinnis testified that his vehicle would fall under the 4WD sport utility vehicle category on Exhibit C. The operating cost per mile for that vehicle is 20.1 cents per mile or $548.73 per month (630 x .201 = $126.63 x 52 = $6,584.76 ÷ 12). The operating cost per mile for Debtor's medium sedan is 15.5 cents per mile or $227.02 per month (338 x .155 = $52.39 x 52 = $2,724.28 ÷ 12). Hence, Exhibit C operating costs total $775.75 and adding to that sum the scheduled $205.00 for auto insurance yields $980.75. The $221.75 difference between that figure and the scheduled operating costs is considered relatively de minimis given the $980.75 figure does not include any amount for registrations, licenses, inspections, parking and tolls.

been a spendthrift, but he does have a total debt load of approximately $79,000.00 that includes a judgment against him.[27] Thus, it is far from certain that he could obtain a vehicle loan with a monthly payment in the range allowed by the IRS standard or successfully renegotiate better terms for the consolidation loan.[28] Hence, given the nature of this obligation and Mr. McGinnis' financial condition, the Court finds this atypical scheduled ownership cost to be reasonable.

*Uncategorized Expenses.*

Mr. Vandenberg indicated that Mr. McGinnis' $1,060.00 child support obligation should be an allowed expense under this category. Though the record is limited, the Court finds this expense to be reasonable.[29]

### Monthly Balance

Without taking into consideration the non-filing spouse's unscheduled monthly payments on unsecured debts, the sum of the allowed monthly expenses is $6,700.75. Subtracting that amount from the monthly income figure of $6,277.00 yields $423.75 negative disposable income.

II. The Substantial Abuse Analysis

Based on the above calculation, Debtor will have no disposable income over three to five years. Parenthetically, the Court observes that this case would not have

---

[27] As set forth on Exhibit G, Mr. McGinnis still owes approximately $60,000.00 on the consolidation note, $1,500.00 on the express credit note, $8,900.00 on the consumer balloon note, $4,500.00 on the judgment against him, and $4,000.00 in credit card debt.

[28] According to Exhibit J, a payment statement for the consolidation loan, the annual percentage rate is 9.00%.

[29] It is not clear from the record how long and in what amount the child support obligation will continue. Mr. Vandenberg alluded to those unknown details in his testimony but neither the U.S. Trustee's attorney nor Debtor's attorney clarified this matter in questioning or in argument. Exhibit T, an order and notice to withhold income for child support suggests that Mr. McGinnis' children were 14 and 17 years old at the time Debtor filed this case. The record does not contain any other details regarding the full extent of Mr. McGinnis' child support obligations.

been subject to an 11 U.S.C. section 707(b) (2000) dismissal if the non-filing spouse had been a joint debtor and had been able to limit his vehicle ownership cost to $338.00 because adding his unsecured debt to Debtor's unsecured debt would have made the impact of $288.25 monthly disposable income negligible.[30] Lastly, to the extent the U.S. Trustee's argument is that any disposable income in a case like this should be applied to a debtor's unsecured debts exclusive of all of a non-filing spouse's unsecured debts, the Court finds that approach to be elevating a debtor's unsecured debts over those of the non-filing spouse.

## CONCLUSION

WHEREFORE, the Court finds that the U.S. Trustee has not overcome the 11 U.S.C. section 707(b) (2000) statutory presumption in favor of granting the Debtor Chapter 7 relief and, therefore, the motion to dismiss must be denied.

A separate Order shall be entered accordingly.

/s/ Lee M. Jackwig
Lee M. Jackwig
U.S. Bankruptcy Judge

Parties receiving this Memorandum of Decision from the Clerk of Court:
Electronic Filers in this Chapter 7 Case

---

[30] If Mr. McGinnis' ownership cost was decreased by $712.00, the sum of the allowed monthly expenses would decrease to $5,988.75. Subtracting that amount from the monthly income figure of $6,277.00 would yield $288.25 monthly disposable income or $17,295.00 disposable income over five years. Assuming the Bank would realize an unlikely $10,000.00 for the vehicle that had secured the consolidation loan, the non-filing spouse's previous total debt load of approximately $79,000.00 would become an unsecured debt load of approximately $69,000.00. Without even taking into account a Chapter 13 trustee's fees and a Chapter 13 debtors' attorney fees, debt service over five years would be 9.5% ([$17,295.00 x 100] ÷ [$112,200.00 + $69,000.00]).